FEHRMAN and wife, Appellants, v. SMIRL, Respondent.*

*April 1—April 30, 1963.*

* Motion for rehearing denied, with $25 costs, on June 28, 1963.

4

5

8

For the appellants there were briefs and oral argument by *Herbert L. Mount* of Milwaukee.

For the respondent there was a brief by *Moore & Moore* of Milwaukee, and oral argument by *Raymond J. Moore* and *Gary E. Moore*.

CURRIE, J.   Plaintiffs Fehrman first contend that the trial court erred in not changing the answer to Question One of the verdict from "No" to "Yes," and in then not answering the unanswered causation question "Yes," so as to entitle plaintiffs to judgment on the special verdict for the damages found by the jury.   Should they not prevail with respect to this contention, they then request a new trial because the trial court erred: (1) In its rulings on evidence, (2) in certain instructions included in the charge to the jury, and (3) in refusing to give an instruction grounded on *res ipsa loquitur*.   In addition to resolving these issues raised by plaintiffs, we have also considered whether this court should exercise its discretion under sec. 251.09, Stats., and grant a new trial in the interest of justice.

*Causal Malpractice as a Matter of Law.*

In order for this court to find that the trial court erred, in not changing the answer to Question One of the special verdict from "No" to "Yes" and in not answering the causation question "Yes," we would have to find Dr. Smirl chargeable with malpractice as a matter of law and find that such malpractice caused Fehrman's disability.   This we cannot do upon the evidence presented by the record on this appeal.   Since plaintiffs have contended that they are entitled to judgment as a matter of law, we have recounted at considerable length, in the preceding statement of facts, a comprehensive synopsis of the evidence which we deem material on this issue.   This synopsis of the evidence discloses two theories, advanced by the expert medical testimony, as explanations of the permanent urinary incontinence which Fehrman has sustained.

The first of these conflicting theories, upon which plaintiffs rely, is based upon the testimony of Dr. Trangsrud. This theory holds that the external sphincter was injured either in the performance of the original operation by Dr. Smirl or in the postoperative care given by Drs. Smirl and McDonell for which Dr. Smirl would be liable.

The opposing theory, advanced by Drs. Smirl and McDonell, is that scar tissue formed in the prostatic urethra in the vicinity of the external sphincter, without fault on Dr. Smirl's part, and resulted in such rigidity that the sphincter cannot function. Plaintiffs attack this testimony on two grounds. First, they assert that Drs. Smirl and McDonell were interested rather than unbiased witnesses. Nevertheless, this was a factor to be considered by the jury in passing on their credibility as witnesses. This court cannot deem their testimony so incredible as to afford no support for the jury's answer to the first question of the verdict. Second, plaintiffs point to Dr. Trangsrud's testimony that, by reason of his course of treatment after Fehrman left the care of Drs. Smirl and McDonell, the scarred-tissue condition of the prostatic urethra had been cleared up so that a normal sphincter would now be able to function. Plaintiffs contend that this testimony of Dr. Trangsrud must be accepted as a verity. We are disinclined to so hold, however, because it falls within the field of expert testimony which the jury has the option to accept or disregard.

The lack of direct eyewitness testimony that the sphincter was injured during the course of the original operation or postoperative care presents a serious flaw in plaintiffs' theory. Expert, medical-opinion testimony must be relied upon to prove this, but even then the jury is not bound to accept such testimony. Furthermore, there is no direct expert, medical testimony that, if the sphincter was so injured during such time, it could only have occurred through the negligence of Drs. Smirl or McDonell. There is expert

medical testimony which will support this inference, but again the jury is not bound to draw such an inference.

The first question of the verdict clearly presented an issue of fact for the jury, and the trial court would have erred had it changed the jury's answer thereto.

### Rulings on Evidence.

In the course of the cross-examination of Dr. Kearns, plaintiffs' counsel asked this question, "And is it not also a fact that the sphincter may be damaged by enucleation where it is either fibrous or adhesive and difficult to remove where it is proximate to the sphincter?" An objection was interposed to the question "as assuming something which was not present in this case," and the trial court sustained the objection. Prior to this ruling Dr. Trangsrud had testified that he had found that Fehrman's external sphincter had been damaged, that in his opinion the damage to the sphincter was responsible for its present failure to function, and that in his opinion the damage to the sphincter had resulted from the operation and the related manipulations that followed it. Dr. Thompson's deposition had also been read into the record previously. In this deposition Dr. Thompson had stated that the verumontanum, which lies between the bladder neck and the external sphincter, was missing, which would indicate that in the course of the operation "this area" adhered to the tissue which was enucleated "and it didn't separate in an ordinary or normal way." In our opinion it was error for the trial court to sustain the objection to the question. The question was proper because counsel obviously sought to explore one possible explanation of the damage to Fehrman's sphincter which Dr. Trangsrud found.

A second ruling on evidence attacked by plaintiffs occurred during the course of Dr. Trangsrud's rebuttal testimony. After he testified that he examined Fehrman with a

cystoscope in December, 1959, the doctor was asked this question and gave this answer:

"*Q*. At that time were you able to find and locate a whole and undamaged sphincter? *A*. I found a portion of the sphincter, which I found moving and trying to close the flow of urine, as I removed the cystoscope, it should properly be called a remnant."

Dr. Smirl's counsel objected and moved that the answer be stricken because "this doctor cannot see the external sphincter by his cystoscopy examination." The trial court then asked, "Can you see the sphincter by this examination, doctor?" Dr. Trangsrud replied, "You cannot see the sphincter." The trial court then struck the previous answer, which counsel had moved be stricken, and instructed the jury to disregard it. It does not appear from the record whether the ring of muscle constituting the external sphincter forms part of the wall tissue of the prostatic urethra, or whether it lies entirely outside such wall tissue. Nevertheless, the record at the time of the foregoing ruling clearly established that an examination by cystoscope enabled the physician to determine something of the condition of the sphincter including whether it had been damaged or a portion thereof removed. Dr. Thompson stated in his deposition that from the cystoscopic examination made of Fehrman at the Mayo Clinic it was determined that some of the external sphincter had been removed "by the previous surgical procedure." Dr. Kearns had also testified that he could demonstrate the competency of sphincters by using a cystoscope. We conclude, on the basis of this evidence, that the trial court should not have stricken Dr. Trangsrud's answer merely on the basis of his ambiguous statement, "You cannot see the sphincter." One possible explanation of Dr. Trangsrud's statement is that he could not see the whole of Fehrman's sphincter because part of it was missing. Another possible interpretation, of course, is that drawn by

the trial judge that the sphincter cannot be seen by a cysto-scope.

A third ruling on evidence attacked by plaintiffs relates to the trial court's overruling an objection made by plaintiffs' counsel to the reading into evidence of the following questions and answers from the deposition of Dr. Thompson:

"*Q.* Is bladder-neck contracture usually due to negligence or malpractice on the part of the surgeon? *A.* No.

"*Q.* Is bladder-neck contracture due to negligence on the part of the surgeon? *A.* You say is it 'usually due,' that is the way of question stands. It is not usually due.

"*Q.* In your physical examination of this patient at the Mayo Clinic, the laboratory tests that were taken, together with the history that you obtained from Dr. Smirl and the patient, your study and consideration of the X rays and reports of the other doctors of the Mayo Clinic, did you find any evidence of negligence? *A.* No, sir."

It is urged that these questions and answers were incompetent because they invaded the province of the jury. This court, however, is committed to the principle that expert opinion testimony is not objectionable merely because it covers one of the ultimate facts to be determined by the jury. *Kreyer v. Farmers' Co-operative Lumber Co.* (1962), 18 Wis. (2d) 67, 76, 117 N. W. (2d) 646; *Zarnik v. C. Reiss Coal Co.* (1907), 133 Wis. 290, 301, 113 N. W. 752; and *Daly v. Milwaukee* (1899), 103 Wis. 588, 590, 79 N. W. 752. See also 7 Wigmore, Evidence (3d ed.), p. 18, sec. 1921. Therefore, the overruling of the objection by the trial court was proper. The trial court was careful to instruct the jury that the weight of the expert, medical-opinion evidence was for the jury alone, and that such opinion testimony is subject to the same rules of credit or discredit as is the testimony of other witnesses.

### Error in Instructions Given.

Plaintiffs also attack several of the instructions included in the trial court's charge to the jury. The first of these read as follows:

"You are further instructed that it is the duty of the patient to follow the reasonable instructions and submit to the reasonable treatment prescribed by his physician or surgeon. If he fails in his duty, and his act or omission directly contributes to the injury or disability, he cannot maintain an action for malpractice against his physician or surgeon, who is also guilty of an act or omission in treating the case."

This instruction was included among the specific instructions having to do with the jury's answering Question One of the special verdict concerning the standard of care observed by defendant Smirl. It obviously has no bearing on this question of the verdict because it concerns a possible issue of contributory negligence on the part of Fehrman. Thus, this instruction had no proper place in the charge because no question on contributory negligence was included in the special verdict. It still would be improper even if given with respect to a specific question on contributory negligence, because under sec. 331.045, Stats., contributory negligence is not a bar to recovery unless such contributory negligence equals that of the person against whom recovery is sought. Furthermore, because of use of the phrase "cannot maintain an action for malpractice," this instruction is highly objectionable because it tends to inform the jury of the legal effect of their answer to a question of the special verdict.

Two other attacked instructions, which were given with respect to the jury's answering Question One of the special verdict, were also objectionable because couched in terms which tended to inform the jury of the legal effect of answer-

ing Question One of the special verdict "Yes." One such instruction stated, "In order to hold him [Dr. Smirl] liable, the burden is upon the plaintiffs to show that he failed in the requisite degree of care and skill." The other commenced, "Before the plaintiff can recover in such an action . . ."

## Res Ipsa Loquitur.

Plaintiffs' counsel raised the issue that plaintiffs were entitled to the benefit of the doctrine of *res ipsa loquitur* by requesting an instruction grounded on that doctrine. The trial court refused to give the instruction apparently on the ground that this court had held the doctrine of *res ipsa loquitur* inapplicable in malpractice cases against physicians. This was so held in *Kuehnemann v. Boyd* (1927), 193 Wis. 588, 592, 214 N. W. 326, 215 N. W. 455. Cf. *Vale v. Noe* (1920), 172 Wis. 421, 179 N. W. 572. The appellant plaintiff in *Ahola v. Sincock* (1959), 6 Wis. (2d) 332, 94 N. W. (2d) 566, sought to have this court reverse its prior holding that *res ipsa loquitur* was inapplicable to medical malpractice cases. Nevertheless, because plaintiff in the *Ahola Case* had failed to request an instruction grounded on *res ipsa loquitur* in the trial court, this court ruled that the applicability of this doctrine to that medical malpractice case would not be considered. The cases from other jurisdictions are split on the question of whether *res ipsa loquitur* may properly be invoked in malpractice cases brought against physicians. Annos. 82 A. L. R. (2d) 1262, and 162 A. L. R. 1265.[1]

---

[1] Among the cases holding that *res ipsa loquitur* may properly be resorted to in medical malpractice cases under certain conditions are: *Dodson v. Pohle* (1952), 73 Ariz. 186, 239 Pac. (2d) 591; *Ybarra v. Spangard* (1944), 25 Cal. (2d) 486, 154 Pac. (2d) 687, 162 A. L. R. 1258; *You Goo Ho v. Dr. Edmund T. K. Ing* (1959), 43 Hawaii 289; *Holcomb v. Magee* (1920), 217 Ill. App. 272; *Frost v. Des Moines Still College* (1957), 248 Iowa 294,

The procedural effect of *res ipsa loquitur* in Wisconsin is that of a permissible inference rather than rebuttable presumption. *Weggeman v. Seven-Up Bottling Co.* (1958), 5 Wis. (2d) 503, 509, 93 N. W. (2d) 467, 94 N. W. (2d) 645, and *Ryan v. Zweck-Wollenberg Co.* (1954), 266 Wis. 630, 649, 64 N. W. (2d) 226. As a permissible inference, the effect of the doctrine of *res ipsa loquitur* is merely to permit the jury to draw a reasonable inference from circumstantial evidence. It would seem to logically follow from this that situations may arise in medical malpractice actions in which it will be proper to invoke the doctrine of *res ipsa loquitur*. We can perceive of no justification for adhering to the rule that *res ipsa loquitur* may never be applied in this

79 N. W. (2d) 306; *Merker v. Wood* (1948), 307 Ky. 331, 210 S. W. (2d) 946; *Higdon v. Carlebach* (1957), 348 Mich. 363, 83 N. W. (2d) 296 (Michigan achieves the *res ipsa loquitur* result without designating it as such); *Jensen v. Linner* (1961), 260 Minn. 22, 108 N. W. (2d) 705; *Vonault v. O'Rourke* (1934), 97 Mont. 92, 33 Pac. (2d) 535; *Becker v. Eisenstodt* (1960), 60 N. J. Super. 240, 158 Atl. (2d) 706; *Benson v. Dean* (1921), 232 N. Y. 52, 133 N. E. 125; *Pendergraft v. Royster* (1932), 203 N. C. 384, 166 S. E. 285; *Davis v. Kerr* (1913), 239 Pa. 351, 86 Atl. 1007; *Johnson v. Ely* (1947), 30 Tenn. App. 294, 205 S. W. (2d) 759; *Fredrickson v. Maw* (1951), 119 Utah 385, 227 Pac. (2d) 772; *Danville Community Hospital v. Thompson* (1947), 186 Va. 746, 43 S. E. (2d) 882, 173 A. L. R. 525; and *Olson v. Weitz* (1950), 37 Wash. (2d) 70, 221 Pac. (2d) 537.

Cases contra are: *Hine v. Fox* (Fla. 1956), 89 So. (2d) 13; *Hoover v. Buckman* (1915), 194 Ill. App. 308; *Lagerpusch v. Lindley* (1962), 253 Iowa 1033, 115 N. W. (2d) 207; *Semerjian v. Stetson* (1933), 284 Mass. 510, 187 N. E. 829; *Facer v. Lewis* (1950), 326 Mich. 702, 40 N. W. (2d) 457; *Wallstedt v. Swedish Hospital* (1945), 220 Minn. 274, 19 N. W. (2d) 426; *Sanders v. Smith* (1946), 200 Miss. 551, 27 So. (2d) 889; *Hunt v. Bradshaw* (1955), 242 N. C. 517, 88 S. E. (2d) 762; *Schoening v. Smith* (1930), 59 N. D. 592, 231 N. W. 278; *Sieling v. Mahrer* (Ohio App. 1953), 71 Ohio L. Abs. 571, 113 N. E. (2d) 373; *Cooper v. McMurry* (1944), 194 Okla. 241, 149 Pac. (2d) 330; *Eckleberry v. Kaiser Foundation* (1961), 226 Or. 616, 359 Pac. (2d) 1090; and *Shockley v. Payne* (Tex. Civ. App. 1961) 348 S. W. (2d) 775.

type of case, and *Kuehnemann v. Boyd, supra,* is overruled in so holding. Nevertheless, this does not mean that an instruction embodying the doctrine of *res ipsa loquitur* is proper in every medical malpractice case.

The difficulty arises in determining the circumstances which make such an instruction either proper or improper. The general rule is that the doctrine of *res ipsa loquitur* may be invoked in medical malpractice actions only where a layman is able to say as a matter of common knowledge that the consequences of the professional treatment are not those which ordinarily result if due care is exercised,[2] and that the doctrine is not applicable when expert medical testimony is required to show negligence on the part of the practitioner.[3] Anno. 82 A. L. R. (2d) 1262, 1274. Those situations in which common knowledge of laymen has afforded a proper basis for invoking *res ipsa loquitur* in medical malpractice actions are summarized in Prosser, Law of Torts (2d ed.), pp. 210, 211, sec. 42, as follows:

"There are, however, some medical and surgical errors on which any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care. When an operation leaves a sponge in the patient's interior, or removes or injures an inappropriate part of his anatomy, or when a tooth is dropped down his windpipe, or he suffers a serious burn from a hot-water bottle, or when instruments are not sterilized, the thing speaks for itself without the aid of any expert's advice."

---

[2] *Lyu v. Shinn* (1953), 40 Hawaii 198; *Merker v. Wood* (1948), 307 Ky. 331, 210 S. W. (2d) 946; *Sanzari v. Rosenfeld* (1961), 34 N. J. 128, 167 Atl. (2d) 625; *Robinson v. Wirts* (1956), 387 Pa. 291, 127 Atl. (2d) 706; and *Nelson v. Murphy* (1953), 42 Wash. (2d) 737, 258 Pac. (2d) 472.

[3] *Wallstedt v. Swedish Hospital* (1945), 220 Minn. 274, 19 N. W. (2d) 426, and *Donaldson v. Maffucci* (1959), 397 Pa. 548, 156 Atl. (2d) 835.

Typical cases illustrating injury to an inappropriate part of the anatomy lying without the operative field wherein *res ipsa loquitur* was invoked, grounded upon the common knowledge of laymen, are *Ybarra v. Spangard* (1944), 25 Cal. (2d) 486, 154 Pac. (2d) 687, 162 A. L. R. 1258 (plaintiff's shoulder injured during appendectomy); *Frost v. Des Moines Still College* (1957), 248 Iowa 294, 79 N. W. (2d) 306 (plaintiff's stomach burned while being prepared for a back operation); and *Jensen v. Linner* (1961), 260 Minn. 22, 108 N. W. (2d) 705 (patient received severe burn to leg just above ankle as a result of phenol dripping thereon in operating room during hysterectomy and appendectomy). Those cases are readily distinguishable from the instant case where the external sphincter was only about one and a half inches from the prostate gland being operated on. Cf. *Dees v. Pace* (1953), 118 Cal. App. (2d) 284, 257 Pac. (2d) 756 (fistula of the bladder developed following hysterectomy). It does not lie within the field of common knowledge of laymen that injury to the sphincter ordinarily does not occur if due care is exercised by the surgeon performing the suprapubic prostatectomy.

Plaintiffs urge that permanent urinary incontinence following a suprapubic prostatectomy on a fifty-three-year-old man is so rare an occurrence as to justify invocation of *res ipsa loquitur*. Some California cases have held an instruction on *res ipsa loquitur* proper where the inference of negligence is grounded on unusual result. Typical of these cases is *Wolfsmith v. Marsh* (1959), 51 Cal. (2d) 832, 337 Pac. (2d) 70, 82 A. L. R. (2d) 1257. In that case a physician during the course of treatment injected a drug into the inner aspect of plaintiff's knee. A thrombosis developed and a "slough ulcer" appeared at the injection site—

a highly unusual result. In its opinion the California court stated (p. 835):

"*It is a matter of common knowledge among laymen* that injections in the arm, as well as other portions of the body, *do not ordinarily cause trouble* unless unskillfully done or there is something wrong with the serum." (Emphasis supplied.)

That part of the holding in *Wolfsmith v. Marsh, supra,* embodied in the above-quoted extract has been severely criticized by Rubsamen, *Res Ipsa Loquitur* in California Medical Malpractice Law—Expansion of a Doctrine to the Bursting Point, 14 Stanford Law Review (1962), 251 (a condensed version of this article appears in Personal Injury Commentator, 1962 Annual, 250). The author, who is the holder of both M. D. and LL.B. degrees, states that the California court's statement in the *Wolfsmith Case* is in error because of the universal recognition among physicians of the likelihood of untoward and unpredictable reactions to many sorts of injected solutions, even though the utmost care attends their use.[4] The author further points out that if physicians are to be held liable for malpractice because of an unusual, untoward result of a procedure or treatment embodying a calculated risk that this may occur, then a physician will be likely to adopt a safer method of procedure or treatment even though in his best judgment the one embodying the calculated risk is advisable.

Happily, the California court in the recent case of *Siverson v. Weber* (1962), 57 Cal. (2d) 834, 372 Pac. (2d) 97,

---

[4] Several courts have recognized that a physician cannot as a general rule be charged with responsibility for the allergies, reactions, or idiosyncracies of patients in treating them. See, *e.g., Lagerpusch v. Lindley* (1962), 253 Iowa 1033, 115 N. W. (2d) 207, and Mogensen v. Hicks (1961), 253 Iowa 139, 110 N. W. (2d) 563. Cf. *Sanzari v. Rosenfeld* (1961), 34 N. J. 128, 167 Atl. (2d) 625, and *Grantham v. Goetz* (1960), 401 Pa. 349, 164 Atl. (2d) 225.

has now abandoned the test of rarity of result as a proper basis for invoking *res ipsa loquitur* in medical malpractice cases, and has overruled several earlier cases in which this test had been applied. We have found no cases from jurisdictions other than California which have adopted the rarity test, and we decline to do so.

It is our considered judgment that the instant case is not a proper one in which to give a *res ipsa loquitur* instruction which is worded so as to permit the jury to infer negligence on the part of Dr. Smirl from any fact of common knowledge possessed by laymen.

Although the rule in a majority of other jurisdictions is otherwise, we are of the opinion that an instruction embodying the principle of *res ipsa loquitur* may be grounded on expert medical testimony in a malpractice case. California so holds. In *Siverson v. Weber, supra,* the supreme court of that state declared (p. 836):

"As a general rule, *res ipsa loquitur* applies where the accident is of such a nature that it can be said, in the light of past experience, that it probably was the result of negligence by someone and that the defendant is probably the person who is responsible. . . . [Citations omitted.] In determining whether such probabilities exist with regard to a particular occurrence, the courts have relied on both common knowledge and the testimony of expert witnesses. (*Seneris v. Haas,* 45 Cal. (2d) 811, 824–826 [291 Pac. (2d) 915, 53 A. L. R. (2d) 124] . . . ) [a medical malpractice case]."

The general rule with respect to *res ipsa loquitur* in actions grounded on negligence, is stated in Prosser, Law of Torts (2d ed.) p. 202, sec. 42, as follows:

"The requirement that the occurrence be one which ordinarily does not happen without negligence is of course only another way of stating a principle of circumstantial evidence, that the accident must be such that in the light of ordinary experience it gives rise to an inference that some-

one has been negligent. *Where there is no basis of common knowledge for such a conclusion, expert testimony may be a sufficient foundation for it."* (Emphasis supplied.)

On principle, we cannot perceive any reason why an exception to this general rule should be made in medical malpractice actions in a jurisdiction such as Wisconsin where the procedural effect resulting from use of *res ipsa loquitur* is that of a permissible inference rather than rebuttable presumption.

Under the facts of the instant case what form should the *res ipsa loquitur* instruction take? If Fehrman's external sphincter was injured during the course of either the first or second operations, Dr. Smirl would be deemed in law to be in control of the situation.[5] Therefore, the instruction in the instant case need not mention the element of exclusive control which ordinarily is included in a *res ipsa loquitur* instruction. See Wis J I—Civil, Part I, 1145. Thus the only other essential element of such an instruction to be covered is that of a result which ordinarily does not occur without negligence.[6] Accordingly, the following would have been a proper instruction to have been given:

---

[5] The trial court properly instructed the jury as follows: "You are instructed that the responsibility of the defendant, Dr. Smirl, to the plaintiff, Oscar A. Fehrman, for malpractice, if any, continued throughout the period of the second operation and the subsequent period during which the defendant treated the plaintiff as his physician and surgeon." This is because Dr. Smirl continued in active charge of Fehrman during and after the second operation. See *Morrill v. Komasinski* (1950), 256 Wis. 417, 426, 41 N. W. (2d) 620.

[6] In states in which contributory negligence bars recovery in negligence actions, plaintiff must not have contributed to cause the accident by his own act in order to successfully invoke *res ipsa loquitur*. Nevertheless, as pointed out in *Turk v. H. C. Prange Co.* (1963), 18 Wis. (2d) 547, 119 N. W. (2d) 365, because of our comparative-negligence statute, sec. 331.045, Stats., this is not the rule in Wisconsin. Therefore, the element of possible contributory negligence is never to be included in a *res ipsa loquitur* instruction.

."If you find that plaintiff Fehrman's external sphincter was injured during either the first or second operations, and you further find from expert medical testimony in this case that this injury to the sphincter is of a kind that does not ordinarily occur if a surgeon exercises proper care and skill, then you may infer from the fact of such injury to the sphincter that Dr. Smirl failed to exercise that degree of care and skill which surgeons who practice in the city of Waukesha or vicinity usually exercise, unless Dr. Smirl has offered an explanation for the injury to the sphincter which satisfies you that such injury did not occur through any failure on his part to exercise due care and skill." [7]

It will be noted that the qualifying phrase, "in good standing of the same school of medicine," appearing after the word "surgeons" in Question One of the special verdict, has been omitted from the above instruction. We deem that such phrase could also have been omitted from Question One of the special verdict since Dr. Smirl made no claim that the treatment and operative procedures followed by surgeons in good standing in the Waukesha community differed according to the school of medicine to which they belonged or varied from that of plaintiffs' expert medical witness, Dr. Trangsrud.

---

[7] *Jaeger v. Stratton* (1920), 170 Wis. 579, 581, 176 N. W. 61, speaks of the physician's duty in terms of "that degree of *care, diligence, judgment, and skill* which physicians in good standing of the same school of medicine usually exercise in the same or similar localities under like or similar circumstances, having due regard to the advanced state of medical or surgical science at the time, . . ." (Emphasis supplied.) Nevertheless, in *Ahola v. Sincock* (1959), 6 Wis. (2d) 332, 348, 94 N. W. (2d) 566, this duty is described simply in terms of "such degree of care and skill as a competent physician usually exercises in the same or similar locality, under like, or similar circumstances, having regard to the advanced state of medical or surgical science . . ." The word "diligence" used in the quotation from the *Jaeger Case* is probably superfluous. Inclusion of the word "judgment" is desirable in a situation in which the physician exercised a choice between two or more procedures or methods of treatment and a claim is made that the procedure or method of treatment chosen constituted malpractice.

The requested instruction on *res ipsa loquitur* which plaintiffs' counsel submitted was improperly worded because, among other deficiencies, it made no mention of expert medical testimony. Therefore, the trial court properly refused to give such requested instruction in the form submitted.

### New Trial in the Interest of Justice.

Because of the errors which occurred in the rulings on evidence, and in the instructions, and because we deem plaintiffs were entitled to a proper *res ipsa loquitur* instruction, we think it probable that justice may have miscarried. Therefore, we exercise our discretionary power under sec. 251.09, Stats., to order a new trial in the interest of justice on all issues except damages. We find the damages fixed by the jury to be reasonable; therefore, there is no necessity that such issue be relitigated. The grounding of the new trial on the exercise of our discretion under sec. 251.09 is not to be interpreted as a holding that the errors committed in rulings on evidence and in the instructions were not prejudicial. Even though none of them standing alone may have been prejudicial, their cumulative effect may very well have been so.

If during the new trial the evidence which allegedly shows negligence on Dr. Smirl's part only concerns injury to the external sphincter, we would recommend submitting an additional question, as the first question of the special verdict, inquiring whether Fehrman's external sphincter was injured in the course of the first or second operations, or the postoperative care. Cf. *Sharp v. Milwaukee & S. T. Corp.* (1963), 18 Wis. (2d) 467, 481, 118 N. W. (2d) 905. If such a question is submitted, then the special verdict should be so worded as to direct the jury not to answer the negligence (malpractice) and causation questions if this first question is answered "No."

In conducting the new trial, none of the facts stated herein are to be construed as the "law of the case" or as limiting the scope of the evidence which may properly be admissible during such new trial.

## Costs.

Plaintiffs have requested permission, under Supreme Court Rule 10 (sec. 251.264, Stats.), to tax costs for the printing of their entire brief which, exclusive of index and synopsis of argument, consists of 101 pages. Although this court is not inclined to favor long briefs, we grant plaintiffs' request because of the complicated nature of the factual situation which resulted in about 46 pages of their brief being devoted to statement of the facts.

*By the Court.*—Judgment reversed, and cause remanded for a new trial on all issues except damages. Plaintiffs are granted permission to tax costs for the printing of their entire brief although it exceeds 50 pages in length.

The following opinion was filed June 28, 1963:

PER CURIAM (*on motion for rehearing*). Defendant's brief in support of the motion for rehearing takes exception to this statement appearing at page 17 of our original opinion:

"Dr. Thompson stated in his deposition that from the cystoscopic examination made of Fehrman at the Mayo Clinic it was determined that some of the external sphincter had been removed 'by the previous surgical procedure.' "

Dr. Thompson's exact testimony on this point is quoted in the statement of facts at page 12. Defendant contends that subsequent questions and answers in Dr. Thompson's deposition establish that the quoted words, "apparently some of the latter has been removed by the previous sur-

gical procedure," refer to scar tissue and not the external sphincter. While this is a permissible interpretation, we deem the one which we drew is equally tenable. However, if such quoted words be deemed to be ambiguous, the interpretation favorable to plaintiff should have been the one to be considered by the trial court in making the ruling on evidence considered at page 17 of the original opinion. This is so even though it is arguable that the jury later by its verdict may be deemed to have drawn the opposite interpretation.

A more-important point which we have considered on rehearing relates to the recommended instruction on *res ipsa loquitur* set forth at page 27 of the original opinion. Whether the evidence presented warrants the giving of a *res ipsa loquitur* instruction always presents a question of law for the trial court to pass on. At the instant trial no medical witness testified directly that the injuring of the external sphincter in performing a prostatectomy constitutes want of ordinary care on the part of the operating surgeon. However, there was medical testimony that in performing a suprapubic prostatectomy the surgeon is careful not to injure the external sphincter. This gave rise to an inference that if the sphincter was injured in the performance of such operation it would constitute a failure to exercise ordinary care thus rendering proper the giving of the recommended *res ipsa loquitur* instruction.

Whether it will be proper to give a *res ipsa loquitur* instruction at the new trial will depend on the expert testimony presented.

The motion for rehearing is denied with $25 costs.